UNITED STATES DISTRICT COURT

DISTRICT OF NEW JERSEY

| | |
|---|---|
| JEREMY MARTIN HAAR, | ) |
|     PLAINTIFF, | )    CASE NO.: 22-7595 (CCC)-(LDW) |
| | ) |
| VS. | )    AMENDED COMPLAINT |
| | ) |
| CFG HEALTH SERVICES, LLC, et al., | ) |
|     DEFENDANTS. | |

## PARTIES

1. The plaintiff, Jeremy Martin Haar, was incarcerated at Essex County Correctional Facility (ECCF) during the events described in this complaint. He was held as a pre-trial detainee at all times.

2. Defendant CFG Health Services LLC is the health care provider contracted with ECCF to provide medical care to inmates. They are sued in their individual capacity.

3. Defendants Bing Gong and Grace Melendez are both medical doctors employed by CFG to provide medical care to ECCF inmates. They are sued in their individual capacities.

4. Defendants Tracie Jean-Francois and Marie Souprant are both registered nurses employed by CFG to provide medical care to ECCF inmates. They are sued in their individual capacities.

5. Defendant Michael Ojelade is a nurse practitioner employed by CFG to provide medical care to ECCF inmates. He is sued in his individual capacity.

6. Defendants William Anderson, Charles Green, Alfaro Ortiz, and Guy Cirillo are the wardens of Essex County Correctional Facility. They are sued in their individual capacities.

7. Defendant Armando B. Fontoura is the sheriff of Essex County and in charge of the county jail. He is sued in his individual capacity.

8. Defendant Essex County is the county in which ECCF is located and is also in charge of the operation of the facility. They are sued in their individual capacity.

9. All the defendants have acted under color of state law at all times relevant to this complaint.

## FACTS

10. On or about November 28, 2020 plaintiff Jeremy Martin Haar was found unconcious in his cell.

11. Upon being found unconcious Mr. Haar was awoken by an officer and was asked what had happened and if he knew why he had passed out.

12. Mr. Haar informed the officer that he had gotten dizzy when he got out of bed to use the restroom and must have hit his head on the metal toilet as he had a bruise on his head, his head felt as if it was being stabbed with ice picks, he felt extremely dizzy, nautious and was unable to stand.

13. The officer informed Mr. Haar that he would call medical and request that someone from the infirmary come evaluate him.

14. A nurse employed with CFG Health Services came to Mr. Haar's cell upon which Mr. Haar as well as the ECCF guard informed the nurse that Mr. Haar had been found unconcious after hitting his head and the ailments that he was experiencing.

15. Mr. Haar requested that he be taken to the hospital as he was displaying signs of a traumatic brain injury and would like to be properly evaluated.

16. The nurse refused to send plaintiff to the hospital as he said that unless you are dying we dont send you to the hospital. In addi=
tion he told Mr. Haar that he would just provide him tylenol if he wanted and to deal with the nausea and diziness.

17. The next morning plaintiff began filing sick calls stating that he was unable to eat, was extremely dizzy, nautious, as well as showing continuous signs of a potential concussion and traumatic brain injury.

18. During pill line plaintiff informed Ms. Jean-Francois that he had passed out last night and the ailments he was experiencing and was told that she would look into it.

19. Ms. Jean-Francois later returned to Plaintiff's cell and told him that the nurse practitioner Mr. O informed her that if I was coherent and able to talk I most likely did not have a head injury and he would see me as soon as it was convient to him.

20. After several days of not being seen Plaintiff began submitting more sick calls stating that he was still showing symptoms of a head injury such as severe headaches, nausea, diziness, and loss of vision.

21. Plaintiff waited several days and was still not seen by the infirmary therefore he continuously asked the pill line nurses when he would be seen including Ms. Jean-Francois and Ms. Souprant. They continuously told him that they understood that he was in severe pain and unable to eat however they could not see him themselves or force the infirmary to see him, provide him care, or send him to the hospital.

22. Over the next several weeks Plaintiff continued to suffer from severe migraines, dizziness, nausea, and blurry vision and at every opportunity he informed correctional staff, as well as CFG staff.

23. Plaintiff submitted several emails to the Wardens of ECCF informing them that he was being refused care by the medical staff. In addition to said emails Plaintiff spoke to the Warden when he did rounds and informed him of his emails to him as well as the fact that he was still being refused care. The warden said he could not do anything to help.

24. During this time Plaintiff continued submitting sick calls through the electronic request system.

25. In addition to Plaintiff's verbal and electronic requests, Plaintiff's family and legal team sent several emails and placed several phone calls to Warden Cirillo, Green, and Anderson, as well as to CFGs main office and the infirmary at ECCF requesting that Plaintiff be given care and diagnosed for his ailments.

26. Plaintiff continued telling pill line nurses daily of his lack of care and the fact that he was still suffering symptoms despite the fact that the injury was weeks old. Staff including Ms. Jean Francois told Plaintiff that they could not force any of the doctors in the infirmary to see him and provide care, that they could not help me, and that I would just have to deal with it.

27. On or about December 28, 2020 Plaintiff spoke to Michelle Ashford a nurse employed by CFG and told her that he was still suffering from severe pain, could not eat, and was still having trouble seeing clearly and asked if she could please speak to NP Ojelade as he had said he would see plaintiff but still hadn't.

28. Nurse Ashford returned to the housing unit and informed plaintiff that unfortunately NP Ojelade refused to see the plaintiff and that she couldn't force him to.

29. Plaintiff informed his family as well as legal team including attorney Edward Robinson and Brian Neary, and they told him that they would reach out to the warden as well as CFG themselves and try and have them provide care.

30. Plaintiff's attorneys informed him that they emailed the wardens of ECCF (Green, Cirillo, and Anderson) as well as called the infirmary however the infirmary did not answer their call.

31. Plaintiff continued to complain every day and submit electronic sick calls all to no avail.

32. On or about December 29, 2020 on the advice of plaintiff's legal team Plaintiff's mother Robin Haar reached out to New Jersey Senator Corey Booker's office in hopes of them convincing the jail to provide the medical care needed by the plaintiff.

33. On December 30, 2020 plaintiff was pulled out of his cell by Sergeant Matos, and questioned as to why Senator Booker's office was calling the jail claiming that the plaintiff was being refused medical care.

34. Plaintiff told Sgt. Matos that he'd been submitting sick calls for weeks, grievances, and even spoke to the warden informing them that he needed medical care and was being ignored.

35. Sgt. Matos told the plaintiff that the jail can not do anything about the fact that CFG was refusing to see him and provide care as they are a private corporation and contracted with Essex County to provide medical care to their inmates.

36. Sgt. Matos did say however that as a result of the phone call from Senator Booker's office he was bringing the plaintiff to the infirmary and he would be evaluated by medical staff.

37. Plaintiff was seen by Dr. P a doctor employed by CFG. Upon informing Dr. P of the fact he had been found unconcious and that he was still showing symptoms of a head injury she questioned as to why plaintiff had not been examined for close to a month since the injury.

38. Plaintiff informed Dr. P that he had submitted countless sick calls, grievances, and spoke to several nurses begging for care but all his request either went completely ignored or he was told that medical was refusing to see him

39. Dr. P informed the plaintiff that unfortunatelty this was extremely common and that she had hard from countless inmates that their sick calls were ignored as well in addition to the fact that CFG tries to provide as little care as possible to save money.

40. After examining plaintiff Dr. P informed him that he most likely suffered a concussion, as well as a potential traumatic brain injury.

In addition plaintiff had ruptured his inner ear drum when he fell and hit his head, and as a result was now diagnosed with vestibulopothy. In addition she informed plaintiff that the headaches tha t the plaintiff had been experiencing would now most likely occur for years if not permanently as a result of his fall and not being given prompt treatment.

41. Dr. P prescribed the plaintiff Topomax to treat his migraines and told him that if his symptoms persisted after starting the Topomax, including the nausea to submit another sick call and that she would try and see him as soon as possible.

42. Plaintiff began taking the Topomax and immediately began feeling relief however his nausea continued.

43. Therefore Plaintiff began submitting sick calls once again.

44. On or about January 10, 2021 Plaintiff was brought down to medical on a stretcher after passing out in the housing unit.

45. Plaintiff was seen by Dr.  Bing Gong who was informed by the plaintiff that he was unable to eat due to constant nausea and that it had been happening since his head injury.

46. Inaddition to the symptoms plaintiff reported his heart rate was over 110bpm and consdiered tachycardic.

47. Dr. Bing Gong performed no examination on the plaintiff, did not attempt to provide any diagnosis, however he did give the plaintiff adavan to slow his heart down and sent the plaintiff back to his housing unit.

48. Despite informing Dr. Gong of his serious medical need plaintiff was given no care for his ailments.

49. Plaintiff continued submitting sick calls stating his nausea and blurred vision and continued informing pill line staff that he needed to be seen.

50. Plaintiff continuously informed correctional staff as well as CFG staff at any opportunity he had that he was unable to eat and that he was loosing significant weight.

51. On or about January 17, 2021 plaintiff was seen in the infirmary for his sick call stating he was unable to eat and weighed. At the time he informed the nurse that he was unable to eat and had been unable to since he suffered his head injury over a month prior.

52. Nurse that examined the plaintiff noticed that he had indeed had lost a significant amount of weight.

53. The nurse told him to wait to see the doctor and gave the plaintiff a Boost nutritional drink and informed him that if he was able to keep it down she would ask the doctor to prescribe him a liquid diet.

54. Plaintiff was able to keep the boost ingested without vomiting therefore the nurse told him that she would inform the doctor he needed to be presribed a liquid diet.

55. Plaintiff was seen by Dr. Grace Melendez, who asked why the plaintiff needed care. He informed her that he had been seen by Dr. P and diagnosed and provided a migraine treatment however he was still experiencing nausea whenever he attempted to eat however he was able to ingest the Boost that the nurse had just provided him.

56. The nurse informed Dr. Melendez that he needed to be prescribed a liquid diet as he had placed several sick calls about nausea, as well had indeed lost significant weight.

57. Dr. Melendez refused to prescribe the liquid diet stating that she was not a neurologist and therefore would not prescribe anything without the plaintiff being properly diagnosed by a neurologist. She also admitted that the plaintiff should had been taken to the hospital when the injury happened and that he needed to be seen by a neurologist.

58. Dr. Meledez placed an order for plaintiff to be taken to a neurologist, however when asked by the plaintiff how long it would take she admitted that it would most likely be several months before he would have the opportunity to be seen and properly diagnosed by a neurologist.

59. Plaintiff requested that Dr. Melendez send him to the hospital immediately for a neurological consult if she would not prescribe him a liquid diet as he was unable to eat andwas feeling extremely weak.

60. Dr. Melendez informed the plaintiff that she was unable to send the plaintiff to the hospital as it is policy to not send someone to the hospital unless they are "dying" or it is 100% necessary.

61. Plaintiff asked her what he was supposed to do then about the fact that he was unable to eat and she told him to eat bland foods and also prescribed him an anti-nausea medication despite knowing that it was a serious injury that was causing the plaintiff's nausea.

62. On or about January 20, 2021 Plaintiff was seen by Dr. P and informed her that he was still experiencing nausea unless he took the anti-nausea medication he was prescribed and even then he was still nausea and it was causing him to be constipated.

63. Dr. P made a note in plaintiff's medical records that he should be considered for release as the jail was unable to provide him proper and timely care needed to properly treat him.

64. At the time of filing this amended complaint the Plaintiff has still not been seen by a neurologist and is still displaying symptoms.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

65. The plaintiff has exhausted his administrative remedies with respect to all claims and all defendants.

## CLAIMS FOR RELIEF

66. The actions of defendant CFG Health Services LLC in having a policy to provide inmates with as little medical care as possible in order to save moneyconstitutes supervisor liability and a direct violation of plaintiff's right to be free from cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution$_{as}$ well as his due process rights under the 14th Amendment.

67. The actions of defendants Bing Gong, Grace Melendez, Michael Ojelade, Tracie Jean-Francois, and Marie Souprant in refusing to provide the plaintiff adquate medical care in addition to acting with deliberate indifference to plaintiff's serious medical needs constitutes a violation to plaintiif's rights under the 14th Amendment to the United States Constitution.

68. The failure of defendants William Anderson, Charles Green, Alfaro Ortiz, and Guy Cirillo in refusing to help plaintiff obtain medical care for his serious medical needs despite their knowledge of him being denied consitutes a violation of his rights guaranteed under the Fourteenth Amendment to the United States Constitution.

69. In the action of having a policy that staff can not force CFG the contracted medical provider for their jail to provide care to inmates defendent Essex County acted with deliberate indifference to plaintiff's serious medical needs in violation of his Fourteenth Amendment right to the United States Constitution.

## RELIEF REQUESTED

WHEREFORE, plaintiff requests that the court grant the following relief.

A. Issue a declaratory judgement stating that:

1. The actions of the defendants in failing to provide adequate medical care for the plaintiff violated the plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

B. Award compensatory damages in the following amounts:

1. $250,000 against defendant CFG Health Systems LLC for the physical and emotional inuury resulting from their policies that result in plaintiff not receiving adequate and proper medical care.

2. $100,000 against defendant Essex County for the physical and emotional injury caused as a result of their policies that resulted in plaintiff being denied medical care.

3. $50,000 jointly and severally against defendants Gong, Melendez Jean-Francois, Souprant , and Ojelade for the physical and emotional injuries caused as a result of their failure and refusal to provide adequate and proper medical care.

4. $25,000 jointly and severally against defendants Anderson, Green, Ortiz, and Cirillo for the physical and emotional injury resulting from their refusal to help plaintiff receive proper and adequate medical care.

C. Award punitive damages in the following amounts.

1. $2,500,000 against defendant CFG Health Systems LLC

2. $1,500,000 against defendant Essex County

3. $500,000 against defendants Gong, Melendez, Jean-Francois, Souprant, and Ojelade

4. $250,000 against defendants Anderson, Green, Ortiz, and Cirillo.

D. Grant such other relief as it may appear that plaintiff is entitled.

July 28, 2023
Repectfully submitted,
Jeremy Martin Haar
08518509
FCI Pekin
PO Box 5000
Pekin, IL 61555